**HINDUSTAN ZINC LIMITED, Plaintiff,**

v.

**C. TENNANT, SONS & CO., OF NEW YORK, Defendant.**

**No. 80 Civ. 3323 (MEL).**

United States District Court, S.D. New York.

Aug. 22, 1987.

---

**40.** Exhibit 14 to Plaintiff's Motion for Summary Judgment at 6.

**41.** Exhibit 31 to Plaintiff's Motion for Summary Judgment.

Cole & Deitz, New York City, Albert D. Jordan, of counsel, for plaintiff.

Thacher Proffitt & Wood, New York City; Joel B. Harris, Samuel Rosenberg, of counsel, and Weil, Gotshal & Manges, New York City; Stephen A. Radin, of counsel, for defendant.

LASKER, District Judge.

This case concerns a contract for the long-term supply of zinc concentrates between an Indian zinc smelter and an international trader of metals, ores and concentrates based in New York. Plaintiff Hindustan Zinc Limited ("HZL"), the buyer under the contract, seeks damages from defendant C. Tennant, Sons & Co. of New York ("Tennant"), the seller, for its failure to deliver eight shipments during the peri-

od 1977–81. Tennant counterclaims for damages relating to the same shipments on the ground that HZL wrongfully rejected Tennant's offers of conforming material.

After hearing the testimony of eight witnesses at trial—including experts for both sides, reading the deposition testimony of several other witnesses, and examining hundreds of pages of documentary exhibits, I find this to be the rare case in which the parties to an ambiguous contract had such fundamentally different meanings in mind when they ostensibly agreed on terms that the contract is void under the doctrine of unilateral mistake. Alternatively, I find that even if the contract were not void, neither party has adduced sufficient proof of damages to support a money judgment in its favor.

## I.

HZL is a corporation owned and controlled by the government of India which operates domestic lead-zinc mines and refineries, including an electrolytic zinc refinery in Viaskhapatnem on the southeast coast of India which is known as the Vizag smelter.[1] The Vizag smelter was designed to produce refined zinc metal from material known as zinc concentrate, itself an intermediate product which is created when zinc-bearing ore is crushed, ground and processed in a variety of ways to separate zinc-bearing particles from useless residual substances such as rock and sand. Concentrate from which zinc is commercially recovered usually contains over 40 per cent zinc and smaller amounts of other "payable" elements (silver, gold, lead, cadmium), so called because the price for a particular concentrate is determined in part by the amount of such saleable materials the concentrate is expected to yield. Zinc concentrates also contain varying amounts of impurities which must be removed or otherwise controlled in the refining process. The amount of each component in a concentrate can be determined by chemically testing a sample, and concentrates can be

---

1. Unless otherwise indicated, the facts found by the court are drawn from the extensive stipulations of fact entered into by the parties prior to

trial. *See* Joint Pre-Trial Order at 1–21 (Jan. 9, 1987) (hereafter "PTO").

blended—*i.e.*, physically mixed—for the purpose of altering the proportion of particular ingredients.

The number and amount of both payable elements and impurities found in concentrates vary substantially depending on the mine source, and may also vary between ores taken from different parts of the same mine. Contracts for the supply of zinc concentrate generally specify either the mine source of the concentrate or the assay—expressed as a percentage for each of as many as 25 named ingredients—of the concentrate expected to be delivered under the contract. The purchase price is generally expressed as a percentage of the currently reported price of zinc and each other element designated as payable under the contract, less a negotiated deduction known as a "treatment charge," with some provision for the allocation of freight costs between buyer and seller.

The most common method for the commercial recovery of refined zinc is the electrolytic process. This process involves several stages in which impurities are removed, reduced, or separated by the use of heat or chemical additives before the final product emerges as zinc ingot. It is in the nature of the process that the non-zinc residue recirculates in the smelting system. If the impurities contained in the concentrate are not removed or sufficiently controlled in the roasting or purification stages, the extraction of zinc may be impaired or the final product rendered substandard. The cyclical nature of the process complicates these problems by permitting the buildup of both impurities and chemical additives. Although most electrolytic smelters use the same basic process, they vary significantly in the design of the purification stage. Plants constructed to utilize specific concentrates of known composition from captive sources such as a mine owned by the smelter are designed with less complex, less flexible purification

capabilities than "custom" smelters built to process concentrates from diverse sources.

The Vizag smelter was designed as a custom smelter by a Polish engineering firm under a contract with the Indian government. The parties agree that the engineering firm's assay specifications for concentrate suitable for the Vizag smelter were so restrictive that no known mine production would conform.[2] Moreover, HZL Chairman A.C. Wadhawan testified that the smelter's purification system utilized an outmoded technology,[3] and HZL admits that the smelter was not designed to cope with levels of concentrate impurities which could have been removed readily by other modern, more expensive custom smelters.[4]

Although construction of the Vizag smelter was not substantially completed until 1977, HZL in 1971 solicited offers from a number of producers and traders, including Tennant, for the long-term supply of concentrate for the new smelter. The solicitation letter described the facility as a new electrolytic smelter which was intended to process concentrate entirely imported from outside India.[5] Enclosed with the solicitation letter was an assay, almost identical to the engineering firm's specifications, which the letter described as an "approximate analysis of the concentrates on which the Smelter is designed." [6]

Following the solicitation of supply proposals, representatives of Tennant and HZL corresponded and met periodically regarding the terms pursuant to which Tennant might provide concentrate to the Vizag smelter as well as HZL's other refinery, the Debari smelter in northwest India. In the early exchanges of proposals, HZL described the material it would require by listing "permissible limits" of each of over 20 elements, expressed either as decimal percentages followed by the words "maxi-

---

**2.** PTO, Stipulated Fact No. 18 & Appendix (hereafter "App.") A.

**3.** Trial Transcript (hereafter "Tr.") at 58–59.

**4.** Plaintiff's Post-Trial Brief at 2 n. 3 (June 17, 1987).

**5.** Plaintiff's Exhibit (hereafter "PX") 3 at 1.

**6.** *Id.* at 3.

mum," "minimum" or "average" or as "Trace." [7] Tennant's early proposals introduced the specifications with the words "zinc concentrates ... assaying approximately as follows" and did not describe the percentages as maximums, minimums or averages.[8] One early communication from Tennant to HZL foreshadowed later problems:

> We have a great number of small productions of zinc concentrates available to us in Mexico, Peru and Canada and naturally the assays tend to vary to a large extent between productions. For this reason it is almost impossible to advise comprehensive assays for all productions, and indeed it is not usually the smelter's practice to insist on assays for very minor or trace elements. I do not think that we have any productions available to us which would meet the permissible limits which you have set for zinc concentrates, in every respect. Accordingly if you have no flexibility in these limits, there may be no way for us to do business together.[9]

In November 1971, Tennant sent HZL a pro-forma contract containing specifications equivalent to earlier assays discussed by the parties but preceded by the words "zinc ores assaying typically." [10]

Representatives of HZL and Tennant met several times in London in November 1972 to negotiate a long-term supply contract for the Vizag smelter. The only available witnesses to the London meetings—Miguel Cantella, a Tennant Vice President and head of its ores department, and S.N. Roy, HZL's Senior Electrical Engineer—did not testify at trial although both were deposed. HZL refused Tennant's request that Mr. Roy, who is still employed by HZL, be present to testify at trial. The recollections of Messrs. Cantella and Roy do not shed much light on the 1972 negotiations. Mr. Roy stated that Tennant personnel refused HZL's repeated requests to identify the mine sources it would use to fulfill the contract.[11] Tennant did agree with respect to certain elements of the assay contained in the November 1971 pro-forma contract to replace the designation "Trace" with a percentage maximum.[12] The parties also agreed to change the word "typically" in the pro-forma contract to "approximately"; however, neither man could recall any specific discussion of the significance the negotiators attributed to the change.[13]

Subsequent correspondence between the parties reflected the agreements reached at the London negotiations,[14] and Tennant stated in one letter:

> We have a number of productions qualifying within the range of assays described in our Clause "Material", therefore, we do not foresee any problems in supplying your refinery with the material we have under this contract.[15]

The final contract signed by the parties in May and July of 1973 contained a "Material" clause which reads: [16]

> Flotation zinc concentrates assaying approximately as follows:

| | |
|---|---|
| Zn [zinc] | 52–54% |
| Pb [lead] | 1.2–2.5% |
| Cd [cadmium] | 0.2–0.5% |
| Fe [iron] | 5.0–6.5% |
| Cu [copper] | 0.2–0.5% |
| Mn [manganese] | 0.2–0.3% |
| As [arsenic] | 0.1–0.2% |
| Sb [antimony] | 0.05–0.10% |

7. PX 3; PX 5; PX 16. It is not clear what the parties understood the specification "trace" to mean. Aubrey Fletcher, the Tennant executive who signed the original contract, defined the term as an amount sufficient to be detected but not measured with precision, such as .001–.003%. Fletcher Deposition (hereafter "Dep.") at 420/167. HZL engineer S.N. Roy, who participated in the negotiation of the contract, stated that the term meant less than .001%. Roy Dep. at 423.

8. PX 4; PX 6; PX 13–14 [PX 14 incorporates PX 13's specifications].

9. PX 6 at 1.

10. PX 17 at 2.

11. Roy Dep. at 419.

12. Cantella Dep. at 191–92, 203.

13. Roy Dep. at 434; Cantella Dep. at 193.

14. PXX 29, 30, 31, 33.

15. PX 30 at 1.

16. PX 1 at 1.

| | |
|---|---|
| S [sulfur] | 30–32% |
| Co [cobalt] | 0.002% Maximum |
| Ni [nickel] | 0.002% Maximum |
| Ge [germanium] | 0.002% Maximum |
| Sn [tin] | 0.004% Maximum |
| CaO [calcium oxide] | Trace |
| MgO [magnesium oxide] | 1.0–1.5% |
| SiO2 [silica] | 1.0–1.5% |
| Cl [chlorine] | 0.06% Maximum |
| Al2O3 [aluminum oxide] | 0.5–1.0% |
| F [fluorine] | 0.01% Maximum |
| Au [gold] | Trace |
| Ag [silver] | 2.0–6.0 oz/DMT [dry metric ton] |
| H2O [water] | 6–8% |

The contract specified deliveries of "about 12,000 metric tons per year from July, 1975 through July, 1980." The parties agree that they know of no mine source from which zinc concentrates conforming precisely to the numerical specifications in the contract could have been obtained.[17]

During 1974–75 Tennant offered five concentrates of varying assays for shipment under the contract's delivery schedule.[18] Although at least four of the proposals appear from HZL's responses to have been rejected on the ground that the percentage content for certain elements varied from the assay range in the contract,[19] HZL informed Tennant in May 1975 that since the Vizag smelter was not expected to be operational until the middle of 1976, the first shipment under the contract should be made in February 1976 and for only 6000 metric tons.[20] Tennant's insistence on shipping the full amounts provided by the contract, even if on a delayed basis,[21] was also rejected by HZL.[22]

In early 1976 Tennant proposed another shipment, which HZL accepted, and 6000 metric tons of material were shipped aboard the vessel Atlantic Hawk in April, arriving in India in June 1976. The assay of this concentrate, as described in Tennant's offer, fell within the contract specifications, with the exception of the percentage for calcium oxide.[23] The Atlantic Hawk shipment was plagued by numerous disputes between the parties concerning the opening of a letter of credit, freight charges, discharge costs, the accuracy of weights taken at the port of destination, and Tennant's right to draw upon HZL's letter of credit prior to final settlement,[24] some of which were not resolved until a year and a half later and none of which are directly relevant to the contract claims in this case. The Atlantic Hawk shipment was the only delivery ever made under the contract.

In December 1976 HZL informed Tennant that the Vizag smelter would not be operational prior to the first quarter of 1977 and that no further shipments of concentrates would be required until the first quarter of 1978.[25] In May 1977 HZL again wrote to Tennant, this time to inform Tennant that the Atlantic Hawk shipment—which had been received almost a year earlier—did not meet contract specifications as to a number of the constituent elements (presumably based on HZL's own chemical tests), that the high levels of copper, silica, and lead had been the cause of serious damage to the smelter, and that all future concentrate shipments would have to meet a revised, significantly more restrictive set of percentage specifications set forth in the letter.[26] It is noteworthy that the levels of lead and silica, even by HZL's own testing of the Atlantic Hawk shipment, did fall within the 1973 contract specifications.[27] Letters containing the revised assay and similar complaints that concentrates shipped had seriously damaged the Vizag plant were sent on the

17. PTO, Stipulated Fact 24.

18. PTO, App. J at 1.

19. PXX 36, 44, 46, 52.

20. PX 39.

21. PX 40.

22. PX 41.

23. PTO, App. J at 1. The parties appear to agree that the material shipped aboard the Atlantic Hawk was a blend of concentrates. Cantella Dep. at 320–21. Mr. Cantella testified that Tennant in the normal course of its business blended concentrates from different sources in order to meet the specifications contained in particular contracts. Id. at 92–100.

24. Tr. at 772–85 (testimony of Stephen Naegle).

25. PX 60.

26. PX 64; PTO, App. K.

27. PTO, App. J at 1.

same day to HZL's three other long-term suppliers.[28] Subsequently, in August 1977, HZL requested renegotiation of the terms of the contract with Tennant, citing market changes in freight costs, treatment charges, and exchange rates that were to HZL's disadvantage under the 1973 agreement.[29]

Representatives of Tennant and HZL met in New York in September and October of 1977 to discuss the renegotiation requested by HZL. Among the Tennant delegation were Mr. Cantella and Stephen Naegle, manager of zinc concentrate trading during the relevant period, who testified at trial. Included in the HZL negotiating team was B.D. Sharma, then head of HZL's commercial division, who also testified at trial. The result of the meetings was an amendment to the contract, signed by both sides and dated October 6, 1977, which in essence rescheduled and reduced the volume of concentrate shipments under the contract (the 54,000 tons of undelivered 1975–80 shipments were converted into eight semi-annual shipments of 6000 tons each to begin in December 1977 and end in June 1981), increased the treatment charge (a deduction from the contract price) from $67 to $136 per ton, and raised the freight cost absorbed by the seller from $15.50 to $25 per ton with any excess to be borne equally by the parties (instead of by HZL alone, as under the original contract).[30] The contract amendment contained no material clause, thus leaving the concentrate specifications in the original contract unchanged. A clause was included, however, which provided: "The full assay reports and samples will be submitted to Buyer at least 2 months before shipment for Buyers approval, in the event of any significant deviation in the elements in the specifications of the main contract." [31]

The parties strongly disagree about what was said in the course of the negotiations about concentrate specifications. Mr. Sharma testified at trial that the HZL representatives requested that the specifications in the existing contract be made tighter by replacing the percentage ranges with maximum and minimum numbers or, alternatively, that Tennant should identify a particular mine source, but that the Tennant representatives refused both requests, stating that they preferred to retain the original contract specifications and would have no difficulty meeting them.[32] Mr. Sharma did, however, recall that at least one particular concentrate was discussed during the negotiations.[33] In contrast, Mr. Cantella testified in his deposition that the Tenant representatives suggested four mine sources—Pine Point in Canada, San Vicente in Peru, Broken Hill and Woodlawn in Australia—and that the HZL people did not indicate that such concentrates would be unacceptable.[34] It was Mr. Cantella's recollection that during the meetings either the HZL delegation was familiar with the composition of a particular mine production being discussed or they were shown documentation of the corresponding assay from Tennant's files.[35] Mr. Naegle testified at trial that HZL initially requested during the negotiations that the revised specifications set forth in HZL's May 1977 letter be made part of the contract, but that Tennant insisted on HZL's approval of several zinc concentrates from known mines which Tennant could deliver under the contract and HZL's representatives ultimately agreed after thorough discussion and examination of various assays that Pine Point, San Vicente, Broken Hill and Woodlawn were acceptable.[36] Mr. Naegle testified that this approval took the form of a "gentleman's agreement," which HZL requested not be part of the written amendment to the con-

28. PXX 66, 67, 68.

29. PX 61.

30. *Compare* PX 2 (1977 amendment) *with* PX 1 (original contract).

31. PX 2 at 2.

32. Tr. at 230–31, 364–66.

33. Tr. at 233–34.

34. Cantella Dep. at 290, 299–300, 308–09.

35. *Id.* at 300–01, 304–06.

36. Tr. at 811–13.

tract in order to preserve its bargaining position with other suppliers from whom HZL hoped to obtain contract amendments containing revised, narrower assay specifications.[37] It was Mr. Naegle's recollection that the clause concerning the submission of assays and samples in advance of shipment for concentrates deviating from the contract specifications was added to the amendment at Tennant's request to leave open the possibility that concentrates other than those from the four mine sources or those falling within the contract's percentage specifications might be acceptable to HZL on a shipment-by-shipment basis.[38]

Days after the contract amendment was signed in October 1977, Tennant sent HZL an assay of the material it proposed to use to fulfill the December 1977 shipment, the first delivery under the amended contract's revised shipment schedule.[39] The source of the material—the Canadian Pine Point mine which had been the subject of discussion in New York—was not mentioned in the communication. Tennant had obtained the Pine Point production by "swapping," or trading, concentrate in its inventory which did not conform to the HZL contract for the Pine Point,[40] which both parties agree at least came close. Tennant also instructed its agents in India to transmit a sample of the proposed concentrate to HZL and to inform them that the shipment would contain "the material that we gave them assays for while they were in New York."[41]

In late November HZL wired Tennant that a letter of credit for the December 1977 shipment would be opened as soon as "detailed assays and freight rate" were provided.[42] Although the assay had been communicated at the outset, HZL may have been referring to the specification for moisture content, which was not included in the otherwise complete assay.[43] Unfortunately for both sides, the swap deal with the owner of the Pine Point mine had fallen through by this time, and Tennant—apparently without explaining that the Pine Point was no longer available—informed HZL that it would be shipping Australian Broken Hill concentrate without providing assays on the ground that HZL was already familiar with this production.[44] HZL promptly replied: "[W]e have agreed only to accept ... material from Peru presumably San Vicente meeting specifications conveyed by C. Tennant by telex ... and our letter of credit is specifically meant to cover that material. We are unable to use the proposed material from Australia or any other source."[45] Tennant informed HZL that it was mistaken about the source of the first proposed shipment and indicated its surprise over HZL's stated inability to use the Broken Hill concentrate (although without referring to any prior approval of such material in New York),[46] and made further attempts to persuade HZL to accept the Australian production to no avail.[47]

Thereafter Tennant proposed shipment of actual Peruvian San Vicente concen-

---

37. Tr. at 815–16.

38. Tr. at 816–18.

39. PX 62.

40. Tr. at 820–21 (Naegle). In this instance, Tennant traded Bolivian concentrate, which contained high levels of silver and indium as well as a number of impurities which posed problems for the Vizag smelter, to Cominco, the owner of the Pine Point mine and itself the owner of a complex refinery with the ability to recover silver and indium—both precious metals—and cope with high levels of other impurities. Thus, to Cominco, the relatively less "clean" Bolivian concentrate was more valuable than its own Pine Point production, while HZL required "clean" concentrate and could not recover either silver or indium. See Cantella Dep.

at 123, 135. Swapping was one of the methods Tennant relied on in the normal course of its business to fulfill its contract obligations. Id. at 146–47.

41. PX 64.

42. PX 68.

43. PX 66 (telex to Tennant's agent requesting moisture content); Tr. at 375–76 (Sharma).

44. PX 69.

45. PX 70.

46. PX 77.

47. PXX 73, 74, 75.

trate, with assays attached,[48] but HZL rejected this material on the ground that its specifications varied from the assay of the material initially offered in October,[49] which of course it must have since the original offer described a different mine production. Although HZL had stated in a communication of January 4, 1978 that it had made alternative arrangements with respect to the scheduled December 1977 shipment,[50] Tennant persisted in its attempt to procure acceptable concentrate and on January 19 wired HZL that it was prepared to make a shipment of material conforming to the assay in the initial October 1977 offer.[51] (Tennant had undertaken to purchase two 6000–ton shipments of Pine Point concentrate from Cominco, the owner of the Canadian mine, subject to HZL's acceptance of the offer.[52]) HZL rejected the offer two days later on the ground that it had made alternative arrangements.[53] Tennant protested but nevertheless pressed ahead with a request that HZL approve delivery of the same concentrate (Pine Point) for the upcoming June and December 1978 shipments and that an additional shipment be scheduled beyond the contract amendment dates to replace the aborted December 1977 delivery.[54] HZL responded with a defense of its prior conduct but did not commit itself to accept the proposed June and December 1978 shipments.[55] In yet a further attempt regarding the Pine Point material, Tennant requested through its agent that HZL indicate its acceptance by February 6,[56] but apparently since HZL did not communicate

its approval until February 25,[57] the purchase deal with Cominco fell apart.[58]

Although additional efforts were made by Tennant to secure Pine Point concentrate in May 1978, curtailed mine production made a purchase from Cominco impossible[59] and market conditions appear to have made a swap unattractive to Cominco.[60] As early as May 1, 1978, Tennant informed HZL that it was unlikely to procure the Pine Point concentrate and stated:

> We find it impossible to locate concentrates that meet the contract specifications so we are forced to say that unless you express your willingness to acceptably change the assay ranges and limits we will be forced to declare force majeure.[61]

Tennant made several further offers of concentrates to HZL before and after the May 1 communication, including May 31 and June 8 offers of four concentrates which included material from the San Vicente, Woodlawn, and Broken Hill mines which Tennant maintains were approved at the 1977 negotiations.[62] HZL rejected all such offers for the stated reason that the assays of the concentrates proposed exceeded the limits of the contract specifications and the high levels of impurities contained therein could not be treated by the Vizag smelter.[63] Although HZL continued to seek concentrate from Tennant as late as August 1978,[64] Tennant on December 28, 1978 began declaring force majeure pursuant to the terms of the contract, stating that "flotation zinc concentrates meeting the assay requirements set forth in [the] contract ... cannot be supplied by

---

48. PXX 76, 78.

49. PX 79.

50. PX 81.

51. PX 82B.

52. Tr. at 834–35 (Naegle).

53. PX 83.

54. Defendant's Exhibit (hereafter "DX") 78.

55. PX 84.

56. PX 86.

57. PX 87.

58. Tr. at 842–43.

59. Tr. at 843–44; PXX 89, 91.

60. PX 94.

61. PX 91.

62. PXX 96, 99.

63. PXX 98, 101.

64. PX 105.

any source." [65] Thereafter, Tennant made such a declaration with respect to each of the remaining shipments required by the terms of the amendment to the contract.

There was testimony at trial about the system used by HZL to determine whether concentrates proposed by Tennant were acceptable under the contract. Mr. Sharma explained that each time an offer was made, his department, the Commercial Division, would compare each specification in the assay of the offered material with the specifications in the contract. If a single "critical" element—which was defined to include cobalt, nickel, germanium, tin, chlorine, and fluorine [66]—deviated by more than 50 percent (*e.g.*, .003% instead of .002% cobalt) or if two or more such elements deviated to any extent, the proposed assay would be referred to the Smelting Division for further review.[67] It was not clear from Mr. Sharma's testimony what standard was applied to decide whether to accept or refer to the Smelting Division concentrates which contained variations in noncritical elements.[68] Mr. Wadhawan, who was head of the Smelting Division during the relevant period, testified that offers of concentrate referred to his department were evaluated on the basis of whether they could be utilized by the smelter under the existing plant and inventory conditions. According to Mr. Wadhawan, this usability evaluation was made without consulting the contract specifications, and he was in fact not aware of the system the Commercial Division used to decide which concentrate offers should be referred to his department. Because Mr. Wadhawan's analysis depended on what material was in the system, in inventory, or expected to be delivered shortly, his decision to accept a given concentrate might vary depending on the time at which it was proposed.[69]

## II.

In accordance with the contract's choice of law clause, this action is governed by the law of Great Britain.[70] English law does not differ from American law in that the task of a court in this situation is to construe the terms of a written agreement to divine the intention of the parties to the agreement. *See Chitty on Contracts* § 765 (25th ed. 1983). The problem here is that the contract between HZL and Tennant is patently ambiguous. It contains the inherently contradictory juxtaposition of the word "approximately" with specifications stated in thousandths of a percentage point and expressed as "maximum." The witnesses to the 1972 contract negotiations had little to say on the subject of what "approximately" was intended to mean at the time the contract was signed, and the experts who testified at trial could not define the word's customary meaning in the trade. The ambiguity is reinforced by the fact that no known concentrate in the world matches the contract's specifications.

Consequently, both sides argue that their interpretation of the contract is the most reasonable under the circumstances that existed between the parties and in the zinc concentrate business at the times the original contract and the 1977 amendment were signed. HZL contends that the contract should be read as requiring delivery of zinc concentrates which were the closest commercially available equivalent to the specifications in the contract. HZL argues that the assay it requested at the time of the original contract negotiations made clear that it intended to procure a particularly clean grade of concentrate, and the use of maximums in the specifications was intended to limit the amount of certain impurities that posed a problem for the Vizag smelter. According to HZL, the inclusion of "approximately" preceding the assay ranges could only be understood by the parties to have afforded minimal leeway in order to

---

65. PX 107; PX 1 at 6 (force majeure clause in contract).

66. Mr. Wadhawan also included arsenic and antimony in his list of critical impurities. Tr. at 21.

67. Tr. at 215–16, 294–97.

68. Tr. at 298–99, 301–03.

69. Tr. at 120–21, 123–28.

70. PX 1 at 6.

accommodate measurement errors, and the material clause in the contract was not altered in any respect by the 1977 amendment to the contract. It is HZL's position that Tennant was obligated to supply conforming concentrates by any means available to it, including purchasing, swapping, or blending, even if the transaction entailed a financial loss.

Tennant contends that the parties intended that the approximate assay specifications in the contract would be flexible enough to include the material offered by Tennant. According to Tennant, its interpretation of the contract is the more reasonable one in light of the exchange of correspondence and discussions between the parties leading up to the 1973 contract, the primitive nature of concentrate production (i.e., the lack of uniformity in both mining and concentrate preparation from day to day even at a single mine source), and the expected processing capacity of what HZL represented to be a modern electrolytic refinery. Tennant argues that its interpretation of the contract is also supported by the parties' agreement during the 1977 renegotiations that four specific mine productions—each varying to some extent from the contract assay—would be acceptable to HZL.

What the parties have succeeded in demonstrating is not that either of their interpretations of the contract is the more reasonable but rather that each entered into and emerged from contract negotiations—not once, but twice—with radically different notions of what Tennant was required to supply and HZL required to accept under the contract. This is not to say, however, that the parties' understandings of the meaning of the contract terms were unreasonable.

Tennant correctly points out that HZL's original solicitation described the Vizag smelter as a modern electrolytic custom smelter, not as an outmoded facility that could process only super clean concentrates, and Tennant's expert, Jacques Jerusalem, a man with 30 years experience purchasing zinc concentrates, testified that

most of the concentrates Tennant offered would have been usable by normal modern electrolytic plants.[71] It is also the case that the contract did not provide for any heightened compensation above that normally paid for zinc concentrate to reward Tennant for procuring extraordinarily clean material, which would have appeared to Tennant both in 1972 and in 1977 to be very difficult, if not impossible, to locate. As to the hotly disputed 1977 gentleman's agreement regarding the approval of four named mine productions, HZL argues convincingly that Tennant's failure to mention the prior approval in New York (as well as Tennant's repeated inclusion of assays for the four mine sources) in the seeming endless series of telexes during 1977–78 casts serious doubt on the parties' mutual understanding that prior approval was formally given for concentrates which did not conform to the assay range in the contract. On the other hand, it is almost inconceivable that Tennant would have agreed to reschedule the contract shipments and grant HZL millions of dollars in treatment charge and freight cost concessions in the 1977 amendment to the contract without some informal assurance from HZL that concentrates Tennant believed it could supply would be deliverable under the contract.

For its part, HZL could reasonably have understood the contract it signed with Tennant to impose strict requirements for the supply of concentrate. Although Tennant balked in 1971 at the imposition of such comprehensive and precise limits, by 1973 it not only agreed to HZL's request for the specification "maximum" following certain elements but assured HZL that it had a number of productions conforming to the assay range in the contract. Moreover, if Mr. Sharma's recollection of the 1977 renegotiations is credited, Tennant was content to continue to proceed under the original contract specifications even after HZL had repeatedly rejected Tennant's proposed concentrates in 1974–75. In addition, the offer and acceptance of the Atlantic Hawk material had demonstrated by the time of the renegotiations that Tennant was capa-

71. Tr. at 673–80; 708–10.

ble of coming close to meeting the original specifications. On the other hand, HZL's system for deciding whether or not to accept an offer of concentrate under one of its long-term supply contracts appeared to be highly artificial and came close to giving HZL an unbridled option to reject concentrates with minute variations from the contract specifications for reasons relating to the Vizag smelter's own inventory and operational problems—an interpretation of the contract which it is difficult to view as reasonable under any circumstances. HZL's expert witness, J. Arthur Marvin, did not offer support for HZL's approach to the evaluation of concentrate offers under the contract, using instead his own highly arbitrary system.[72]

■ The only conclusion that can be reached under all the circumstances of the making of the contract and its renegotiation is that Tennant and HZL had entirely different meanings in mind when they described the material to be delivered pursuant to the contract. Under British law the contract is therefore void according to the doctrine of unilateral mistake, and neither side can be held liable for breach of contract.

> The terms offered by a party (including his description of the subject-matter) may contain a latent ambiguity, so that they may reasonably be understood by the offeree in a sense other than that which was quite as reasonably intended by the offeror. If the parties are genuinely at cross-purposes in this way, the contract is void for want of certainty.

*Benjamin's Sale of Goods* § 216 (1974). Although the doctrine of unilateral mistake is utilized restrictively in Great Britain, it appears to apply in this case.

> In most cases the application of the objective test [*i.e.*, the language used by one party, whatever his real intention, is to be construed in the sense in which it would be reasonably understood by the other] will preclude a party who has entered into a contract under a mistake from setting up his mistake as a defence to an action against him for breach of

contract. If a reasonable man would have understood the contract in a certain sense, then, despite his mistake, the court will hold that the mistaken party is bound. But where parties are genuinely at cross-purposes as to the subject matter of the contract and the terms of the offer and acceptance are so ambiguous that it is not possible to point to one or other of the interpretations as the more probable, the court must necessarily hold that no contract exists.

*Chitty on Contracts* § 330 (25th ed. 1983).

The parties' persistence in their respective intentions with regard to the contract specifications is evident from the comedy of errors that was played out in the year following the signing of the amendment. As Tennant continued to offer and HZL continued to reject various shipments during 1977–78, their communications often evinced genuine surprise, frustration, and even insult at what each perceived to be the other's inexplicable behavior. Amazingly, even after numerous abortive attempts at delivery, a full-scale contract renegotiation, and countless telex communications, the parties appeared to inhabit different commercial worlds.

This case presents the rare instance in which both parties are mistaken as regards the other's intention and neither party's understanding is objectively correct. *See, e.g., Raffles v. Wichelhaus*, 159 Eng.Rep. 375, 2 Hurl. & C. 906 (Ex.1864) (buyer and seller entered into contract for the sale of cotton due to arrive aboard the "Peerless" from Bombay, where unknown to the parties there were two ships of that name coming from Bombay, one in October and one in December, and each party contemplated delivery aboard a different vessel). A careful discussion of the case law governing a situation such as this, in which it can be said that "the parties are not *ad idem* as to the subject matter of the agreement" or that "there was a failure to have a true meeting of the minds as to the subject matter of the agreement," is contained in *CH Pearce & Sons Ltd. v. Stone-*

---

**72.** Tr. at 491–501.

*chester Ltd.,* (C.A. Nov. 29, 1984) (available on LEXIS, Enggen library, Cases file). American law is in accord with this doctrine. *See* Restatement (Second) of Contracts § 20(1) (Rev.ed. 1981); *Oswald v. Allen,* 417 F.2d 43 (2d Cir.1969).

### III.

Even if either side had been able to show that its interpretation of the terms of the contract was objectively reasonable or that the other party actually understood the contract in the same way, I would still conclude that no damages should be awarded since neither party has succeeded in proving its damages.

### A.

Because HZL made no cover purchases, it seeks damages for non-delivery on the theory contained in § 51(3) of the United Kingdom Sale of Goods Act (1979), which provides: "Where there is an available market for the goods in question the measure of damages of prima facie to be ascertained by the difference between the contract price and the market or current price of the goods at the time or times when they ought to have been delivered...." HZL's expert, Mr. Marvin, who was responsible for the purchase and sale of zinc concentrates for New Jersey Zinc Company from 1976 to 1981, was the architect of HZL's damage calculation.[73] Mr. Marvin began by developing a set of requirements for zinc concentrates that would be acceptable based on the contract specifications.[74] Then he assembled a list of some 15 mine productions that would have met these requirements during the 1977–81 period covered by the contract amendment.[75] Next, Mr. Marvin prepared a graph that depicted in rough form a trend line of the prices paid for zinc concentrates on the spot market during 1978–81.[76] Finally, after estimating from the graph the percentage differential between spot and contract prices during the relevant time period, he calculated the dollar amount of the spot market price differential for each shipment required under the Tennant–HZL contract.[77]

Tennant challenges HZL's damage claim on a number of grounds. Tennant contends that awarding HZL damages would grant it a windfall because as a result of production problems with the Vizag smelter and the ensuing excessive concentrate inventories,[78] HZL was in a better position as a result of not having to pay millions of dollars for supplies' delivered under the contract which it might never have been able to use. Tennant also contends that § 51(3) of the Sale of Goods Act is not applicable in this situation since there is no "available market" for the undelivered goods. According to Tennant, if the contract is interpreted in as strict a fashion as HZL would have it, there might well be no concentrates in the world to make up such a market, and even if such concentrates could be found, the nature of zinc concentrates—non-uniform, non-fungible, and not traded on any exchange or in any organized fashion—requires contract-by-contract negotiation that does not permit the ascertainment of a market price. Lastly, Tennant characterizes HZL's damage calculation as so speculative and its expert's credibility as so weak as to preclude basing an award of damages on HZL's presentation.

---

**73.** Tr. at 435–60.

**74.** PX 127.

**75.** PX 125.

**76.** PX 128.

**77.** This first calculation compared the price of concentrate shipments containing payable zinc content as specified in the contract with the price of named substitute concentrate shipments containing significantly higher zinc content, resulting in a damage figure of just under $2.25 million. PX 126. HZL withdrew this calculation in mid-trial and revised it so that both contract and substitute shipments were assumed to have the same zinc content, resulting in a damage figure of under $1.43 million. PX 142.

**78.** The parties vigorously disagree about the levels of concentrate inventory at the Vizag facility during the relevant period. *Compare* DXX 163–69 *with* Plaintiff's Objections to Exhibits D–163 to D–169 Inclusive (June 23, 1987).

■ It is not necessary to reach Tennant's first two arguments in order to reject HZL's damage claim, for the methods and bases for the damage calculation performed by HZL's expert were so unreliable as to preclude relief on the last ground alone.

At the heart of HZL's revised damage calculation is the spot market price premium. In order to determine this premium during the period covered by the contract between the parties, HZL's expert drew a curve, labelled a trend line, by extrapolating from what appear to be six points, each representing the price paid for an actual shipment of zinc concentrate purchased on the spot market.[79] Then, for each shipment date under the 1977 contact amendment, the level of the trend line was apparently compared to the price that would have been paid for concentrate under the Tennant–HZL contract to arrive at the spot market differential.[80]

There are serious flaws in this presentation. In the first place, HZL's expert did not produce at trial the actual contracts from which the six key price points were calculated,[81] which prevented adequate verification of numerous aspects of the calculations ranging from the determination of the treatment charge under a particular contract to the accounting for payable elements other than zinc.[82] The five pages of handwritten notes which were produced were not sufficient to allow even the expert witness himself to answer the questions raised about the calculations during cross examination.[83] This gap in documentation was particularly significant for two reasons which relate to the expert's credibility.

First, the witness often did not appear to have a firm grasp of the reasons he took certain steps in his calculations,[84] including certain areas of methodology about which serious questions were raised, such as the use of U.S. contracts to generate predictions concerning spot contract prices based on European market prices for zinc.[85] Second, the care with which the witness approached his tasks was seriously impeached in connection with his preparation of a list of mine productions which he testified satisfied his interpretation of the contract specifications and were commercially available during the 1977–81 period.[86] During a lengthy cross examination on this subject, it emerged that many assays for the listed concentrates were either missing or in conflict with the specifications in the chart prepared by the witness, that a number of the assays relied on by the witness were out of date—some decades old, that some of the concentrates either were not in fact available during the relevant period or were not known by the witness to be available at that time, and that the witness had inserted percentage specifications—seemingly in an arbitrary fashion—in some cases where such specifications did not exist in the assays available to him.[87]

A different problem with the damage calculation—apart from the inability to verify the underlying data and the way it was calculated—is the validity of the process used to derive the spot market price differential. As an initial matter, it is not at all clear how the crucial curve, which is intended to cover a four-year period, was drawn. It appears to have been traced not by extrapolating from clusters of many spot prices but rather by connecting six discrete

---

79. PX 128. The prices used in the graph are expressed as percentages of the market price for refined zinc.

80. PX 142 at line 6(b).

81. Tr. at 593–94, 597.

82. Tr. at 594–95, 599–606.

83. DX 144 at 13–17.

84. *E.g.*, Tr. at 477 (responding at deposition to question about a point on the graph: "I don't

know. I can't verify that at all. I don't know what the hell that is."); Tr. at 586 (responding to question why certain concentrates were selected for use in damage calculation chart: "I just selected them."); Tr. at 608 (responding to question about method by which contract prices based on U.S. prices were converted to percentages of European Producer Price: "If that gives you that figure, why, that's what I did, yes.").

85. Tr. at 606–14.

86. PX 125.

87. Tr. at 481–571.

price points by means of discontinuous straight lines.[88] The crudeness of this approach would not be a cause for concern if, as in the expert's own words, the points on the trend line were "not intend[ed] ... to be anything but a guide to tell you that the market was advancing."[89] It is astounding, however, that the expert purported to use this trend line to derive the percentage differences—to as many as two decimal places—between spot and HZL contract prices. It is this percentage difference which constitutes the most important number in HZL's entire damage calculation.

The upshot of this analysis is that HZL's case for damages is far too uncertain to permit the granting of any more than nominal damages even if it had proved that Tennant had breached the contract.

## B.

█ Less need be said on the score of Tennant's proof of damages on its counterclaim. Tennant contends that, relying on HZL's commitment to purchase 12,000 tons of concentrate per year beginning in 1975, it accumulated sufficient material to fulfill its obligations under the contract and suffered losses when during 1977–78 it sold 45,000 tons of concentrates which represented its excess inventories resulting from HZL's failure to accept Tennant's proposed shipments. Mr. Naegle testified that Tennant began drawing down these inventories as early as the summer of 1977 in light of the difficulties encountered in making shipments under the contract up to that time and continued to sell off such material through 1978.[90] Tennant calculated its damages in two ways: first, in what it called a comparison method, it determined

the difference between the revenue received when the concentrates were sold to third parties and the revenue that would have been received had the concentrates been sold to HZL at each semi-annual shipment date under the contract; second, in what it called a liquidation method, Tennant determined the difference between what it paid to acquire the concentrates and the revenue it received when the concentrates were sold to third parties.[91] Roughly speaking, the former method appears to measure its expectation damages, amounting to over $4.39 million, and the latter its reliance damages, amounting to over $3.15 million.

The fatal flaw in Tennant's damage presentation is the absence of any satisfactory explanation of how the particular concentrates claimed to have been accumulated to satisfy the HZL contract were selected from the total inventory. Tennant's principal expert witness on damages testified that before he performed the damage calculations other Tennant officials instructed him that there were a series of sales that were made in regard to HZL.[92] What is known from the record is that concentrates were not earmarked for any particular customer by physically segregating them or labelling them as such.[93]

HZL correctly points out a number of problems with the concentrates that were selected, taken as a group, that call into question the method of selection. First, little attempt was made at trial to show that the concentrates used for Tennant's

---

**88.** PX 128. To add to the mystery, the six points appear not to correspond to actual spot contract prices but to the points used as references for calculation of the spot premium on the contract shipment dates. One would expect the tracing of the curve to precede the determination of the points on the curve which correspond to the shipment dates.

**89.** Tr. at 594.

**90.** Tr. at 847–52.

**91.** DX 158 at 2; Tr. at 956–57 (Thomas Mulhere, Tennant metals and raw materials trader).

**92.** Tr. at 957, 979–80.

**93.** Tr. at 980.

damage calculations would have been acceptable under the contract.[94] Of the eight concentrate lots selected only two—from San Vicente—were among the four mine productions claimed to have been discussed by the parties in New York in 1977; the other six were either from the San Ignacio mine or a Bolivian production called Porco, the latter not acceptable to HZL by Tennant's own admission.[95] Second, the parcel size of the various concentrate sales matched to the contract shipment dates in most instances vary greatly from the 6000 WMT required by the contract.[96] Third, under the chronology posited by Tennant its last liquidation shipments occurred in September 1978.[97] This would mean that Tennant had purchased concentrates to fulfill the June 1981 HZL contract shipment well prior to the fall of 1978 and had taken its last step to liquidate excess inventory related to the HZL shipment four months prior to its first formal declaration of force majeure under the contract. Without further explanation, such timing appears unlikely. Finally, no explanation was given for the fact that in several instances (corresponding to three of the eight semi-annual shipments) the price paid by Tennant for the concentrate it claims to have purchased to supply HZL substantially exceeded the price it would have received from HZL under the contract, which would have meant losses for Tennant had HZL accepted those concentrates.[98]

Consequently, Tennant too has failed to make out a case for damages.

\* \* \* \* \* \*

In sum, I conclude that the contract between the parties is void under the doctrine of unilateral mistake, and alternatively, that neither party has succeeded in proving its damages. This Memorandum constitutes my findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure. For all the reasons expressed above, judgment is granted dismissing the complaint and dismissing Tennant's counterclaim.

It is so ordered.

---

94. Assays for some of the concentrates used in Tennant's damage calculation are collected at PTO, App. R.

95. *See* note 40 *supra.* Of course, the Bolivian concentrate was a perennial candidate for a swap with Cominco for Pine Point concentrate, which was acceptable to HZL; however, Tennant made no attempt to show that such swaps were likely or even possible at particular shipment dates under the contract or whether the Bolivian concentrate was acquired for the express purpose of effecting such swaps.

96. DX 158 at 1.

97. Plaintiff's Post-Trial Brief at 29 n. 28; DX 158.

98. DX 158 at 2, references A, A–1, B, C.